ANA MARIE BARRIERE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barriere v. Commissioner
Docket No. 6147-88
United States Tax Court
T.C. Memo 1991-314; 1991 Tax Ct. Memo LEXIS 366; 62 T.C.M. (CCH) 102; T.C.M. (RIA) 91314; July 9, 1991, Filed *366 Decision will be entered under Rule 155. Ana Marie Barriere, pro se. Margaret R. Reichenbert, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax, Secs. [1]
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6654(a)
6661(a)
6651
1986
$ 31,794
$ 1,590 *
$ 1,537
$ 7,949
$ 7,949
Respondent conceded the sections 6654 and 6661 additions to tax. The issues for decision are: (1) To what extent, if any, petitioner under-reported her income; (2) whether petitioner is liable for additions to tax for negligence under section 6653(a)(1)(A) and (B); and (3) whether petitioner is liable for additions to tax *367 for failure to file a tax return under section 6651(a)(1). Petitioner resided in North Hollywood, California, at the time she filed the petition in this case. FINDINGS OF FACT On December 16, 1986, petitioner was sentenced in the United States District Court for the Central District of California for conspiring to buy, receive, and possess stolen mail (specifically, United States Treasury checks) and for knowingly buying, receiving, and possessing two stolen United States Treasury checks during 1986. Petitioner failed to file a Federal income tax return or make estimated tax payments for tax year 1986. In 1986 petitioner bought stolen Treasury checks from Geardo Garcia (Mr. Garcia), who worked for the United States Post Office and delivered mail to the Mountain View postal district in California. Mr. Garcia stole Treasury checks and credit cards from the mail he delivered. He purchased false identification cards from Antonio Fomseca-Luna, alias El Grande, in order to cash the stolen checks and use the stolen credit cards. El Grande introduced Mr. Garcia to petitioner. Mr. Garcia sold stolen Treasury checks to petitioner on at least six occasions. The usual commission equalled *368 10 percent of the check's face value. One, petitioner gave Mr. Garcia a diamond ring as collateral when she did not have enough money to pay him. Mr. Garcia returned the ring 2 weeks later when he sold petitioner more stolen checks. Mr. Garcia contacted petitioner by calling her at one of three phone numbers she gave him at the beginning of their relationship. Mr. Garcia's address book corresponded to many of the phone calls he made to petitioner. Petitioner hired individuals to cash the Treasury checks in California. She arranged for these individuals to receive false Social Security and alien registration cards bearing the name of the true payee and the photo of the individual attempting to illegally cash the check. For various reasons, not all of the checks were cashed. At the conclusion of an investigation for credit card misuse and forgery, the South San Francisco Police Department arrested Mr. Garcia. The police found stolen Treasury checks in his automobile, which led to his arrest by postal inspector R. Douglas Nunes (Inspector Nunes) for mail theft. Mr. Garcia agreed to help the inspector identify and execute a "sting" operation on petitioner. Using a telephone *369 number petitioner had provided during their previous encounters, Mr. Garcia arranged to sell her stolen Treasury checks at Mr. Garcia's hotel in Los Angeles, California. Inspector Nunes recorded the entire transaction on audiotape, which reveals petitioner's ongoing criminal relationship with Mr. Garcia. Petitioner and her boyfriend, Martin Trujillo, were arrested immediately after leaving Mr. Garcia's hotel room. When arrested, petitioner possessed the stolen checks, approximately $ 6,500 in cash, and a significant amount of gold jewelry. Petitioner was sentenced to 1-1/2 years in prison (of which she served 6 months) and 5 years probation. Mr. Garcia spent 2 days in prison for stealing credit cards and Treasury checks. He also received 3 years probation from the State of California and 5 years probation from the Federal Government. OPINION Petitioner argues the Government wrongfully kept her jewelry in contravention of the District Court Judge's orders, because the IRS seized the jewelry in a jeopardy assessment for tax year 1986. The IRS subsequently auctioned the jewelry at a public sale and applied the proceeds to petitioner's account. The actions of the special agent *370 and the IRS relating to petitioner's jewelry bear no legal significance in this case because, under the circumstances, we have no jurisdiction to review the jeopardy assessment. Section 7429(b)(2)(B) applies only when a petition is filed before the assessment or levy is made. Respondent came forward with substantive evidence establishing more than a "minimal evidentiary foundation" demonstrating that petitioner received unreported income from the negotiation of stolen Treasury checks. Accordingly, the burden of rebutting the presumption of correctness of respondent's deficiency determination remains on petitioner. . Some of the testimony by both petitioner and Mr. Garcia lacks credibility; therefore we will not rely on it in rendering our decision. Mr. Garcia claimed to have sold petitioner a Treasury check dated February 3, 1986, during the second week of January. This is clearly impossible. Moreover, Mr. Garcia had a strong incentive to exaggerate petitioner's role: a lenient sentence. After setting up the sting operation on petitioner, Mr. Garcia spent only 2 days in jail. As shown below we think *371 it likely that Mr. Garcia had other "customers" for his stolen checks (as he obviously did for the stolen credit cards). He also cashed some checks himself. Petitioner possessed approximately $ 6,500 in cash at the time of her arrest. She contends she earned the money cleaning houses, and alternatively, that her brother gave her the money to set up a space at a local swap meet. We do not believe either of these explanations. Petitioner claims she met Mr. Garcia only twice, once at their introductory meeting, and next during the sting operation. Petitioner also maintains she was merely a conduit for the stolen checks. Petitioner's uninhibited dialogue [2] during the sting operation contradicts her assertions. ANA MARIE:
I thought that I would save these checks
until the next trip.
MR. GARCIA:
Are you sure?
ANA MARIE:
Yes.
MR. GARCIA:
Yes.
ANA MARIE:
Yes, I am going to sell them in Mexico. * * *
MR. GARCIA:
Then I will call you the fourth? And then so I can come on the fifth of next month.
ANA MARIE:
Un huh, call me for, for, so that I can
entertain the lady. . . . she is already
gone. . . . that I can buy, because she just left,
all I can do is wait and buy - save for next month.
MR. GARCIA:
Yes.
ANA MARIE:
Here I am. . . . I don't know what day of the week
she will come. . . . but she is on her way this week.
MR. GARCIA:
Un huh.
ANA MARIE:
But I tell you that I am going to save these
for next month. . . . enough I thought it would be
a lot more. * * *
ANA MARIE:
Now, I am going to pay everything at 20
percent. We can make a deal this is low
season, til [sic] tax time then we go to 10
percent again.
*372 Respondent argues that the stolen checks from the Mountain View area, $ 120,000 worth, were all sold to petitioner, who subsequently negotiated and received the proceeds from $ 100,000 of the checks. We disagree. First, Mr. Garcia did not sell all of the stolen checks to petitioner. He cashed some checks himself with false identification obtained from El Grande and, from this record, we conclude he sold some of the stolen checks to El Grande and other unidentified persons. Second, petitioner negotiated far fewer checks than respondent's figure of $ 100,000. The check dated February 3, 1986, in the amount of $ 1,322.62 was never negotiated. Neither were checks found in Mr. Garcia's car at the time of his arrest, nor the $ 12,000 worth of checks used in the sting operation. Additionally, the stolen checks were difficult to negotiate. One witness who cashed checks for petitioner successfully cashed only one check in three attempts. Third, respondent fails to take into account checks purchased by petitioner and subsequently resold to third parties. Petitioner's statements on the audiotape and Mr. Garcia's testimony convince us that petitioner, in addition to employing agents *373 to cash the checks, sold some outright to a contact in Mexico. Respondent tied petitioner only to check cashing in California, yet many of the checks were cashed in Mexico, most likely by the third party who purchased the checks outright from petitioner. Accordingly, we find petitioner under-reported her income by $ 30,000. [3]. We conclude that petitioner is liable for additions to tax for negligence and failure to file an income tax return pursuant to sections 6653(a)(1) and 6651, respectively. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for 1986, and all Rule references are to the Tax Court Rules of Practice and Procedure. *50 percent of the interest due one $ 31,794.↩
2. All parties spoke Spanish throughout the transaction. The transcript has been translated into English.↩
3. ↩
$ 50,000
Cash received from negotiation of stolen checks
<10,000>
Cost of purchasing stolen checks
<10,000>
Cost of negotiating stolen checks
$ 30,000
Unreported income